**FILED**
**APRIL 19, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | |
| | ) | No. 38551-5-III |
| J.B. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |
| | ) | |

FEARING, J. — We affirm the superior court's involuntary commitment of appellant J.B. based on a grave disability. In doing so, we reject J.B.'s legal contention, under RCW 71.05.020(24)(b), that a petitioner for involuntary commitment must show deterioration of the commitee's mental health from some earlier condition.

FACTS

This petition for involuntary commitment began with an alleged assault on law enforcement officers by J.B. Before this confrontation, J.B. had incurred ten criminal convictions.

On seeing two law enforcement officers, J.B. exited his vehicle, approached the officers, and spoke with them while recording the interaction with his cell phone. After reviewing a database, the officers learned that J.B. had multiple outstanding charges and a suspended driver's license. When the officers arrested him, J.B. allegedly resisted and spat at the officers.

No. 38551-5-III
*In re the Detention of: J.B.*

The State of Washington charged J.B. with two felony counts of assault in the third degree. The superior court found J.B. incompetent to assist in his own defense as a result of a mental disease or defect. The court dismissed the criminal charges and ordered seventy-two hours' detainment for evaluation of a potential civil commitment of J.B. Following a mental status evaluation, Western State Hospital staff diagnosed J.B. with "Other Specified Schizophrenia Spectrum and Other Psychotic Disorder." Clerk's Papers (CP) at 10.

PROCEDURE

Drs. Daniel Paredes and Wendi Wachsmuth of Western State Hospital petitioned the superior court to detain J.B. for involuntary treatment beyond the seventy-two hours. The petition alleged that J.B. suffered a grave disability and he presented a substantial likelihood of repeating violent acts as a result of a behavioral health disorder.

In a declaration supporting the commitment petition, Drs. Daniel Paredes and Wendi Wachsmuth averred that J.B. had a history of mental illness and treatment beginning in 2007. The declaration reported that J.B. maintained a disordered thought process, disclosed only vague information, and encountered difficulty remaining focused on conversations. J.B. paused for extended periods of time before answering questions. Although J.B. successfully communicated his needs, his speech pattern lagged. He answered questions with tangential and disorganized responses. J.B. expressed grandiose personal goals and experiences with religious and philosophical themes. When speaking

2

to treatment providers, J.B. turned and looked out of the windows behind himself and

peered the background for others. J.B. responded favorably to antipsychotic medications

when he willingly accepted the medication or when a court order forced administration of

drugs, but J.B. refused medications and other treatment on commitment. J.B. denied any

mental illness and functional impairment.

Daniel Paredes and Wendi Wachsmuth avowed, in their joint declaration, that

Western State Hospital staff had noted, during J.B.'s earlier visits, behaviors similar to

the recent assault on law enforcement officers. J.B. assaulted staff members. The joint

declaration of the mental health treatment providers concluded:

> Due to his [J.B.'s] proven history of assaultive behavior without
> such psychiatric and psychosocial interventions, it is recommended he
> remains in the secure setting of Western State Hospital for continuing
> treatment. In his current state, it is substantially likely he would reoffend in
> a manner similar to that described in the arresting officers' reports if he was
> discharged to the community without further treatment.

CP at 12.

A superior court commissioner conducted a hearing on the petition for

commitment. At the evidentiary hearing, the State, through the petitioners Daniel

Paredes and Wendi Wachsmuth elected to limit the commitment request solely on a grave

disability.

During the hearing testimony, Dr. Wendi Wachsmuth described J.B. assaulting

other patients without provocation. J.B., according to Wachsmuth, spoke loudly, rapidly,

and incoherently to staff members. J.B. frequently peered over his shoulder even when in a secure room. This paranoia contributed to his aggressive behavior.

Dr. Wendi Wachsmuth testified that J.B. did not recognize the need for medication and refused to take any psychoactive drugs. J.B. likely would not seek treatment if discharged from the hospital. He lacked volitional control of his aggressive behavior without medication. Wachsmuth concluded that J.B. would be unable to meet his basic health and safety needs in the community.

J.B.'s great-grandmother testified on his behalf. She testified that she had spoken with an alternative treatment facility, Navos that would provide housing and care for J.B.

J.B. testified that he previously resided and engaged in services at Navos. He avowed that other patients assaulted him at Western State Hospital, but that staff unfairly accused him of being the aggressor because staff only witnessed the ending of the fights. On cross-examination, J.B. addressed his insight into his condition and aptitude for treatment:

> Q [State Attorney:] Do you have a mental health disorder?
> A [J.B.:] I have been diagnosed with an unspecified mental health disorder not otherwise specified and with it being a broad, generic, understanding that everybody has faults, I definitely recognize that I'm not perfect and there are definitely areas in my life to improve, and I am definitely a believer in God and I know that every single day is a day to build upon, to build a strong character, and build upon those building blocks and use different coping mechanisms to deal with stress, use different coping mechanisms to deal with anxiety, to deal—use different coping mechanisms to deal with anger, to use different coping mechanisms

4

to deal with insecurity that essentially everybody on a daily basis that the finest citizens use—

Q [State Attorney:] I'm going to interrupt you real quick, [J.B.].

Can I—I'm just going to ask another question. What is your plan to engage in safe behaviors if you were to be released from the hospital?

A [J.B.:] Absolutely.

I have a loving great grandmother who definitely can always use a helping hand around the house. It is Covid and I don't want to be in and out of any type of environment as well as I am—my father is an attorney and I have been making contact with him and I look forward to being able to make a connection with him and being able to take over his law firm that he had and holds out in Texas. He received a JD [juris doctor degree] at the University of Washington in 1997 and I was born in 1995. So essentially I'm a prodigy of law.

And I definitely am dedicated to the highest calling of life, and God's calling within my life, and to be able to remain, to keep, negative people out of my association to definitely be [indiscernible] to God [indiscernible] every single day. As well as engage into all and any opportunities to be able to speak not only with resource specialists, as far as having any type of needs, to be able to attend and sign up for online classes, and be able to pursue and further my education, as well as being able to attend different online seminars about entrepreneurship—

CP at 55-56 (some alterations in original).

The superior court commissioner ordered ninety days involuntary commitment because of a grave disability. In findings of fact, the commissioner wrote:

[J.B.'s] current mental status examination reveals:

Disorganization in thought expression; latency; loosely organized. Speech rapid; difficult to follow; loud. Insight lacking. Not appropriate in the hospital w/out incidences of aggression. Paranoid ideation. Refusing meds. Attends groups sporadically.

CP at 22.

J.B. requested that a superior court judge revise the commissioner's decision. The superior court denied J.B.'s motion and adopted the commissioner's findings and conclusions.

## LAW AND ANALYSIS

On appeal, J.B. assigns factual and legal error. He first contends that the superior court applied an erroneous test when assessing whether he suffered from a grave disability. He maintains that the superior court should have required a showing by the petitioners of deterioration from an earlier status. Second, he argues that, even under the test applied by the superior court, the State failed to present sufficient facts for involuntary commitment.

### Meaning of Deterioration

The Involuntary Treatment Act (ITA), chapter 71.05 RCW, governs civil commitments of persons suffering from behavioral health disorders. In accordance with the act, the State holds a legitimate interest in protecting the community from the dangerously mentally ill and in providing care to those who are unable to care for themselves. *In re Detention of LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986).

Involuntary commitment administers "a massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972). Accordingly, substantive due process of law will not permit the State to commit an individual solely on the basis of mental illness. *In re Detention of LaBelle*, 107 Wn.2d

6

196, 201 (1986). A State cannot constitutionally confine without more an individual who

can survive safely in freedom by himself or with the help of willing and responsible

family members or friends. *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S. Ct. 2486,

45 L. Ed. 2d 396 (1975).

Under Washington's ITA, mental health treatment providers may commit a person

for involuntary treatment if "[s]uch person is gravely disabled." RCW 71.05.280(4). A

person may be "gravely disabled" under two alternative tests:

> "Gravely disabled" means a condition in which a person, as a result
> of a behavioral health disorder: (a) Is in danger of serious physical harm
> resulting from a failure to provide for his or her essential human needs of
> health or safety; or (b) manifests severe deterioration from safe behavior
> evidenced by repeated and escalating loss of cognitive or volitional control
> over his or her actions and is not receiving such care as is essential for his
> or her health or safety.

RCW 71.05.020(24). Following a finding of grave disability, a court may order

involuntary commitment for up to ninety days if the court also finds "that the best

interests of the person or others will not be served by a less restrictive treatment which is

an alternative to detention." RCW 71.05.320(1)(a).

At the involuntary commitment hearing, petitioners Daniel Paredes and Wendi

Wachsmuth relied only on prong (b) of RCW 71.05.020(24). On appeal, the State also

contends that sufficient evidence supported a finding of a grave disability under prong (a)

of the statute. J.B. objects to the employment of prong (a) because the superior court

7

never entertained involuntary commitment under this prong.  Since we affirm based on prong (b), we do not address prong (a).

RCW 71.05.020(24)(b)'s definition of "grave disability" requires the petitioner to show a "severe deterioration from safe behavior."  By focusing on the word "deterioration," J.B. contends that petitioners Daniel Paredes and Wendi Wachsmuth needed to present evidence of some earlier base line of his mental health status, during which he engaged in safe behavior, and some worsening of his mental health from that base line.  Whereas J.B.'s contention reasonably follows from the language of the statutory definition, such an interpretation of the statute would create farcical results.  Someone who had engaged in extended unsafe behavior could avoid needed commitment and the public could face danger unless the petitioner unearthed evidence of a past time when the commitee behaved appropriately.  Therefore, the Washington Supreme Court rejected this argument in *In re Detention of LaBelle*, 107 Wn.2d 196, 205-08 (1986).

When undertaking an extended analysis of prong (b) in *Detention of LaBelle*, the Washington Supreme Court wrote that a strict and literal reading of prong (b) would:

> result in absurd and potentially harmful consequences, for a court would be required to release a person whose condition, as a result of the initial commitment, has stabilized or improved minimally—*i.e.*, is no longer "escalating"—even though that person otherwise manifests severe deterioration in routine functioning and, if released, would not receive such care as is essential for his or her health or safety.

*In re Detention of LaBelle*, 107 Wn.2d at 207 (citing predecessor statute). The Supreme Court upheld a commitment when the commitee's condition had stabilized or improved slightly while in the hospital, because the weight of the evidence suggested he would be unable to receive essential care if released.

Based on *Detention of LaBelle*, prong (b) does not require a petitioner to demonstrate a commitee's prior medical history in order to prove deterioration. If a petitioner can demonstrate that a defendant's routine functioning is negatively impacted by a lack of cognitive or volitional control, a court may infer that the respondent's mental condition deteriorated. A court's inquiry focuses on the recent incidents or episodes leading to the initial evaluation for commitment, not the history of mental illness.

Sufficiency of Evidence

J.B. challenges the sufficiency of evidence even under *Detention of LaBelle* rules of grave disability. The petitioner bears the burden of proving by clear, cogent, and convincing evidence a grave disability. *Morris v. Blaker*, 118 Wn.2d 133, 137, 821 P.2d 482 (1992). A trial court's finding of grave disability must be supported by substantial evidence that the trial court could reasonably have found to be clear, cogent, and convincing. *In re Detention of LaBelle*, 107 Wn.2d 196, 209 (1986). In considering a commitee's challenge to evidence, this court views the evidence in the light most favorable to the petitioner and does not review the trial court's decisions regarding witness credibility or the persuasiveness of the evidence. *In re Detention of A.F.*, 20 Wn.

App. 2d 115, 498 P.3d 1006, 1012 (2021). When a superior court denies a motion to revise a commissioner's ruling, the commissioner's decision becomes the superior court's decision. *In re Detention of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021).

A trial court must enter written findings of fact sufficiently specific to permit meaningful review. *In re Detention of LaBelle*, 107 Wn.2d 196, 218 (1986). Findings may be sufficient even if they are implicit in the formal written findings of fact. *In re Detention of A.F.*, 498 P.3d 1006, 1011 (2021). Even when the written findings are inadequate, this court may look to the record to help determine the sufficiency of the evidence. *In re Detention of LaBelle*, 107 Wn.2d at 219.

The commissioner's written findings, as adopted by the superior court, declare:

> [J.B.'s] current mental status examination reveals:
> Disorganization in thought expression; latency; loosely organized. Speech rapid; difficult to follow; loud. Insight lacking. Not appropriate in the hospital w/out incidences of aggression. Paranoid ideation. Refusing meds. Attends groups sporadically.

CP at 22.

The evidence, consistent with the findings of fact, showed J.B. to attack law enforcement officers and other patients in Western State Hospital as a result of his mental illness. J.B.'s aggressiveness resulted from his paranoia of others. He refused treatment. Thus, the record contains sufficient evidence that J.B.'s mental functions had deteriorated due to a lack of cognitive and volitional control.

No. 38551-5-III
*In re the Detention of: J.B.*


In *In re Detention of LaBelle*, 107 Wn.2d 196 (1986), the Supreme Court upheld a prong (b) commitment when Maurice Marshall, suffering from a mental disorder, acted hostile towards others and assaulted a bartender. In *In re Detention of A.M.*, 17 Wn. App. 2d 321 (2021), this court found deterioration in routine functioning when A.M. harassed a stranger and maintained an agitated and angry state.

CONCLUSION

We affirm the 90-day involuntary commitment of J.B.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Staab, J.


11